**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| *In re: Optalis Healthcare Data Security Incident Litigation* | No. 26-cv-12344-LVP-DRG<br>Hon. Linda V. Parker<br>**CLASS ACTION**<br>**DEMAND FOR JURY TRIAL**<br>**CONSOLIDATED COMPLAINT** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Lori Danielkiewicz and Priscilla Muslin, by Justine Maldonado, her Power of Attorney, individually and on behalf of all others similarly situated, bring this class action against Defendant Optalis Healthcare ("Optalis"). Plaintiffs seek to obtain damages, restitution, and injunctive relief for the Class and Subclass, as defined below, from Optalis. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. This class action arises out of the recent targeted cyberattack and data breach on Optalis's network that resulted in unauthorized access to highly sensitive information pertaining to job applicants, employees, patients, and/or clients of

Optalis. Plaintiffs bring this class action against Optalis for its failure to safeguard their and Class Members' personally identifiable information ("PII")[1] and private health information ("PHI")[2] (collectively "Private Information"). As a result,

---

[1] Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifies that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers, etc.). The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Protected health information ("PHI") is a category of information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act ("HIPAA"). *Inter alia*, PHI includes test results, procedure descriptions, diagnoses, personal or family medical histories, and data points applied to a set of demographic information for a particular patient. Under HIPAA, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations, "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individuals that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are consideration protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited July 28, 2026).

Plaintiffs and Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the imminent risk of future harm caused by the compromise of their sensitive personal information.

2. Optalis is a senior-care and post-acute healthcare company operating communities that provide post-hospital rehabilitation, skilled nursing, long-term care, assisted living, memory care, and therapy services.[3]

3. As a condition of receiving employment and/or its services, Optalis's employees, patients, and/or clients are required to provide and entrust Optalis with sensitive and private information, including PII.

4. Optalis's Privacy Policy, as posted on its website, states as follows:

> **Information We Collect**
> The personal information that you are asked to provide, and the reasons why you are asked to provide it, will be made clear to you at the point we ask you to provide your personal information… We are committed to ensuring that your information is secure. To prevent unauthorized access or disclosures, we have put in place suitable physical, electronic and managerial procedures to safeguard and secure the information we collect online.
>
> **How We Use Your Information**
> We use the information we collect in various ways, including to:
>
> - Provide, operate, and maintain our website

[3] *Home*, OPTALIS HEALTH & REHABILITATION, https://www.optalishealthcare.com/ (last visited July 9, 2026).

- Improve, personalize, and expand our website
- Understand and analyze how you use our website
- Develop new products, services, features, and functionality
- Communicate with you, either directly or through one of our partners, including for customer service, to provide you with updates and other information relating to the website, and for marketing and promotional purposes
- Send you emails
- Find and prevent fraud
- Log files[4]

5. Notably, however, Optalis's only available Privacy Policy pertains solely to its website.[5] Indeed, Optalis does not have any information available to the public regarding its Privacy Policy as it relates to handling PII/PHI.

6. Optalis discovered that its systems were subject to a cybersecurity attack between April 14, 2025 and April 19, 2025, which resulted in unauthorized access to Private Information (the "Data Breach").[6]

7. Optalis has already admitted that "unauthorized access to [its] network occurred" and "a limited amount of personal information was removed from [its] network in connection with this incident."[7]

8. As a result of Optalis's failure to secure Plaintiffs' and Class Members' Private Information, the Data Breach compromised the following types of PII, which

---

[4] *Privacy Policy*, OPTALIS HEALTH & REHABILITATION, https://www.optalishealthcare.com/privacy-policy/ (last visited July 23, 2026).
[5] *Id.*
[6] Exhibit A, June 29, 2026 Notice of Breach addressed to Priscilla Muslin ("Notice").
[7] *Id.*

include, but are not limited to:

a. full names;

b. Social Security numbers;

c. driver's license numbers;

d. state identification numbers;

e. credit or debit card information;

f. financial account information;

g. medical treatment and diagnosis information; and

h. health insurance policy numbers.

9. Currently, the precise number of persons injured is unclear. Upon information and belief, however, the size of the putative class can be ascertained from information in Optalis's custody and control. Further, upon information and belief, the putative class is over one hundred members, as it includes Optalis's employees, patients, residents, and/or clients.

10. Notwithstanding the implications of the Data Breach, Optalis waited until June 29, 2026 before it began notifying the class—approximately 441 days after the Data Breach began.[8]

11. Thus, Optalis kept the Class in the dark, thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

[8] *Id.*

12. Optalis's notice letter did not disclose how it discovered the cybersecurity attack, how the attack was detected and terminated, the means and mechanisms of the cybersecurity attack, the reason for its delay in notifying Plaintiffs and the Class of the Data Breach after learning that Private Information was impacted, how Optalis determined that PII was "removed from [its] network," and, importantly, what steps Optalis took following the Data Breach to secure its systems and prevent future cyberattacks.

13. Optalis reported that the "personal information . . . removed from [its] network in connection with this incident[] include[ed] full names and one or more of the following: Social Security number, driver's license number or state identification number, credit or debit card information, financial account information, medical treatment and diagnosis information, and/or health insurance policy number."[9]

14. Optalis has done little to remedy its Data Breach. In fact, in its notice letter, Optalis merely referred Plaintiffs and Class Members to third-party companies that offer "one free credit report every 12 months," provided recommendations placing a security freeze and/or fraud alert on impacted credit files.[10] Such referrals are wholly insufficient to compensate Plaintiffs and Class Members for the injuries

[9] *Id.*
[10] *Id.*

that Optalis inflicted upon them.

15. The Data Breach was a direct result of Optalis's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect clients' PII and PHI from the foreseeable thread of a cyberattack.

16. By taking possession and control of Plaintiffs' and Class Members' Private Information for its own pecuniary benefit, Optalis assumed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiffs' and Class Members' Private Information against unauthorized access and disclosure. Optalis also had a duty to adequately safeguard this Private Information under industry standards and duties imposed by statutes, Section 5 of the Federal Trade Commission Act ("FTC Act"). Optalis breached that duty by, *inter alia*, failing to implement and maintain reasonable security procedures and practices to protect employees', residents', patients', and/or clients' Private Information from unauthorized access and disclosure.

17. The exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. As a result of the Data Breach, Plaintiffs and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private

Information in the coming years, including, but not limited to, unauthorized access to email accounts, tax fraud, and identity theft.

18. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take several additional prophylactic measures.

19. There has been no assurance offered by Optalis that all impacted Private Information or copies thereof have been recovered or destroyed.

20. As a result of Optalis's inadequate security and breach of its duties and obligations, the Data Breach occurred, causing Plaintiffs and Class Members to suffer injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, emotional distress, and the present and imminent risk of fraud and identity theft caused by the compromise of their sensitive personal information. Plaintiffs' and Class Members' sensitive personal information—which was entrusted to Optalis, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

21. The injury to Plaintiffs and Class Members was compounded by the fact that Optalis did not notify clients that their Private Information was subject to

unauthorized access and exfiltration until June 29, 2026. Optalis's failure to timely notify the victims of its Data Breach meant that Plaintiffs and Class Members were unable to take affirmative measures to prevent or mitigate the resulting harm.

22. Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiffs' and Class Members' sensitive and confidential Private Information still remains in the possession of Optalis. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

23. Optalis disregarded the rights of Plaintiffs and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard client PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiffs and Class Members prompt and adequate notice of the Data Breach.

24. In addition, Optalis and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Optalis properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

25. The security of Plaintiffs' and Class Members' identities is now at risk because of Optalis's wrongful conduct as the Private Information that Optalis collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

26. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to actual fraud and identity theft and a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against fraud and identity theft.

27. Plaintiffs and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

28. Plaintiffs and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft. Due to the fact that the exposed information includes Social Security numbers and other immutable personal details such as medical treatment and diagnosis information, Plaintiffs and Class Members will be at risk of identity theft and fraud that will persist throughout the rest of their lives.

29. Plaintiffs bring this action on behalf of themselves and individuals in the United States, as well as Subclass Members (defined below), whose Private Information was exposed as a result of the Data Breach that occurred between April

14, 2025 and April 19, 2025, and which Optalis only first publicly acknowledged on or about June 29, 2026. Plaintiffs seek to hold Optalis responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiffs seek to remedy the harms resulting from the Data Breach on behalf of themselves and all similarly situated individuals whose Private Information was accessed and exfiltrated during the Data Breach.

30. Plaintiffs thus seek remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and declaratory and injunctive relief including improvements to Optalis's data security systems, future annual audits, and adequate credit monitoring services funded by Optalis.

## II. THE PARTIES

**Plaintiff Lori Danielkiewicz**

31. Plaintiff Danielkiewicz is a resident of the State of Michigan.

32. Plaintiff Danielkiewicz is a former employee of Optalis.

33. On or about June 29, 2026, Plaintiff Danielkiewicz received a copy of a Notice of Data Incident from Defendant Optalis.

**Plaintiff Priscilla Muslin, by Justine Maldonado, her Power of Attorney**

34. Plaintiff Priscilla Muslin is a resident of the State of Michigan.

35. Plaintiff Muslin is a former patient of Optalis, having received care

from 2023 to 2024.

36. On or about June 29, 2026, Plaintiff Muslin received a copy of a Notice of Data Incident from Defendant Optalis.

**Defendant**

37. Defendant Optalis Healthcare is a private, for-profit healthcare network and senior living operator incorporated in Michigan with its principal place of business at 25500 Meadowbrook Road, Suite 230, Novi, Michigan 48375.

## III. JURISDICTION AND VENUE

38. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from Optalis.

39. This Court has personal jurisdiction over the Defendant named in this action because Optalis is headquartered in this District and Optalis conducts substantial business in Michigan and this District through its headquarters, offices, parents, and affiliates.

40. Venue is proper in this District under 28 U.S.C. § 1391(b) because Optalis and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Optalis' Business

41. Optalis is a senior-care and post-acute healthcare company operating communities that provide post-hospital rehabilitation, skilled nursing, long-term care, assisted living, memory care, and therapy services.

42. As part of its business, Optalis receives and maintains the PII/PHI of thousands of its patients, residents, and employees.

43. In collecting and maintaining the PII/PHI, Optalis agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII/PHI.

44. In the ordinary course of receiving health care services, all Class Members provided their patient information (including Plaintiffs), and Optalis received this sensitive, personal, and private information, as part of the Class entering into a healthcare professional-patient relationship, and as a part of Class Members receiving medical services.

45. Plaintiffs and Class Members conferred a benefit on Optalis by turning over their Private Information to Optalis and by paying for products and services that should have included adequate cybersecurity protection (and vendors with adequate cybersecurity protections) to protect their Private Information.

46. Upon information and belief, Optalis funds its data security measures and vendors entirely from its general revenue, including payments made to it by Plaintiffs and Class Members. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide for a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Optalis.

47. Due to the nature of the services it provides, Optalis acquires and electronically stores PII and PHI. Optalis was therefore required to ensure that PII and PHI were not disclosed or disseminated to unauthorized third parties without Plaintiffs' and Class Members' express written consent.

**B. The Data Breach**

48. Between April 14, 2025 and April 19, 2025, Optalis was hacked in the Data Breach.[11]

49. Through its notice letter sent to Plaintiffs and Class Members over a year later, Optalis admitted that "unauthorized access to [its] network occurred" and "a limited amount of personal information was removed from [its] network in connection with this incident."[12]

---

[11] Exhibit A, Notice.
[12] *Id.*

50. Because of Optalis's Data Breach, at least the following types of PII/PHI were compromised:

a. full names;

b. Social Security numbers;

c. driver's license numbers;

d. state identification numbers;

e. credit or debit card information;

f. financial account information;

g. medical treatment and diagnosis information; and

h. health insurance policy numbers.[13]

51. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Optalis's custody and control. And upon information and belief, the putative class is over one hundred members as it includes Optalis's patients, residents, and employees.

52. Upon information and belief, the cyberattack was targeted at Optalis, due to its status as a healthcare vendor that collects, creates, and maintains Private Information on its computer networks and/or systems.

53. In the course of the Data Breach, one or more unauthorized third parties

---

[13] *Id.*

accessed and acquired files in Optalis's computer systems containing unencrypted Private Information of Plaintiffs and Class Members.

54. Plaintiffs were not aware of the Data Breach until receiving Optalis's belated letter.

55. Optalis's disclosures are otherwise deficient. They do not include basic details concerning the Data Breach, including, but not limited to, why PII and PHI were store on systems without adequate security, the deficiencies in the security systems that permitted unauthorized access, whether the data was encrypted or otherwise protected, and what Optalis knows about the degree to which the data has been disseminated.

56. Optalis has failed to disclose practically all of the details of the Data Breach and its investigation into the Data Breach. Without such disclosure, questions remain as to the full extent of the Data Breach, the actual data accessed and compromised, and what measures, if any, Optalis has taken to secure the PII and PHI still in its possession. Plaintiffs seek to determine the scope of the Data Breach and the information involved, obtain relief that redresses the harm to Plaintiffs' and Class Members' interests, and ensure that Optalis has proper measures in place to prevent similar incidents form occurring in the future.

57. As evidenced by the Data Breach, Optalis did not use reasonable security procedures and practices appropriate to the nature of the sensitive

information they were maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

58. As evidenced by the Data Breach, the Private Information contained in Optalis's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

**C. The Value of Private Information**

59. Optalis was aware that the Private Information it collected is highly sensitive and of significant value to those who would use it for wrongful purposes.

60. While the greater efficiency of electronic health records translates to cost savings for providers, it also comes with the risk of privacy breaches. PII and PHI contain a plethora of sensitive information (e.g., patient data, patient diagnosis, lab results, medical prescriptions, treatment plans, etc.) that is valuable commodities to identity thieves and cybercriminals. As the Federal Trade Commission (the "FTC") recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[14]

61. In April 2020, ZDNet reported in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are

[14] Federal Trade Commission, What To Know About Identity Theft (available at https://consumer.ftc.gov/articles/what-know-about-identity-theft) (last accessed Nov. 13, 2025).

now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for complaints as revenge against those who refuse to pay."[15]

62. Indeed, a robust illegal market exists in which criminals openly post stolen PII and PHI on multiple underground websites, commonly referred to as the "dark web." The high value of such data is reflected in the prices buyers will pay: PHI, for example, has been reported to sell for as much as $363 on the dark web, according to the Infosec Institute. [16]

63. PHI is particularly valuable because criminals can use it to target victims with frauds and swindles that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

64. Moreover, "fullz" packages, which include "extra information about [a] legitimate credit card owner in case" a scammer's "bona fides are challenged when

---

[15] https://www.zdnet.com/article/ransomeware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Nov. 13, 2025).

[16] Center for Internet Security, *Data Breaches: In the Healthcare Sector* (available at https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/) (last accessed Nov. 13, 2025).

they attempt to use the credit card" are also offered on the dark web.[17]

65. Stolen Private Information is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

66. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[18]

67. The Private Information of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20] Criminals can also purchase access

---

[17] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud- dark-web/ (last accessed Nov. 13, 2025).

[18] *Shining a Light on the Dark Web with Identity Monitoring, IdentityForce*, Dec. 28, 2020, https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Nov. 13, 2025).

[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web- how-much-it-costs/ (last visited Nov. 13, 2025).

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-

to entire company data breaches from $999 to $4,995.[21]

68. In addition, due to the highly valuable nature of PHI, the FBI has warned healthcare providers that they are likely to be the targets of cyberattacks like the one at issue here.[22]

69. Once Private Information is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

70. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

71. Data breaches facilitate identity theft as hackers obtain consumers' Private Information and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

---

much-your-personal-information-is- selling-for-on-the-dark-web/ (last visited Nov. 13, 2025).

[21] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the- dark/ (last visited Nov. 13, 2025).

[22] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK2 4U20140820.

72. Further, criminals often trade stolen PII and PHI for years following a breach. Cybercriminals can post stolen PII and PHI on the internet, thereby making such information publicly available. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use Private Information to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[23]

73. The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime.[24] Approximately 21% of victims do not realize their identity has been compromised until more than two years after it happens.[25] This gives thieves ample time to seek multiple treatments under the victim's name. In fact, forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[26] The

[23] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited Nov. 13, 2025).
[24] *Id.*
[25] *See* Medical ID Theft Checklist (available at https://www.identityforce.com/blog/medical-id-theft-checklist-2) (last accessed Nov. 13, 2025).
[26] Experian, The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches (available at https://www.experian.com/assets/data-

GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[27]

74. The market for Private Information has continued unabated to the present, and in 2023 the number of reported data breaches in the United States increased by 78% over 2022, reaching 3205 data breaches.[28]

75. The exposure of Plaintiffs' and Class Members' Private Information to cybercriminals will continue to cause substantial risk of future harm (including identity theft) that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off of this highly sensitive information.

76. Optalis knew, or should have known, the importance of safeguarding PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Plaintiffs and Class Members because of a breach. Optalis failed, however, to take

---

breach/white-papers/consequences-medical-id-theft-healthcare.pdf) (last accessed Nov. 13, 2025).

[27] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent* (2007).

[28] Beth Maundrill, *Data Privacy Week: US Data Breaches Surge, 2023 Sees 78% Increase in Compromises*, INFOSECURITY MAGAZINE (Jan. 23, 2024); https://www.infosecurity-magazine.com/news/us-data-breaches-surge-2023/ (last visited Nov. 13, 2025); *see also* Identity Theft Resource Center, *2023 Data Breach Report*, https://www.idtheftcenter.org/publication/ 2023-data-breach-report/ (last visited Nov. 13, 2025).

adequate cybersecurity measures to prevent the Data Breach from occurring. As detailed above, Optalis knew or should have known that the development and use of such protocols were necessary to fulfill its statutory and common law duties to Plaintiffs and Class Members. Its failure to do so is therefore intentional, willful, reckless, and/or grossly negligent.

77. Optalis disregarded the rights of Plaintiffs and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions, (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information, (iii) failing to take standard and reasonably available steps to prevent the Data Breach, (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time, and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

**D. Entities in the Healthcare Filed are Prime Targets for Cyberattacks**

78. Optalis was on notice that entities in the healthcare field are susceptible to and prime targets for cyberattacks because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees, customers and patients—all extremely valuable in underground markets.

79. This was known and obvious to Optalis as they observed frequent public announcements of data breaches affecting the healthcare industry and knew that information of the type it collected, maintained, and stored is slightly coveted and a frequent target of cybercriminals.

80. For example, a report by the HIPAA Journal noted that "Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more records have been reported to the HHS' Office for Civil Rights. Those breaches have resulted in the exposure or impermissible disclosure of 382,262,109 healthcare records. That equates to more than 1.2X the population of the United States. In 2018, healthcare data breaches of 500 or more records were reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[29]




81. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of

[29] https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Nov. 13, 2025).

which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[30]

82. Optalis was also on notice that the Federal Bureau of Investigation has been concerned about data security in the healthcare industry. On April 8, 2014, the FBI's Cyber Division issued a Private Industry Notification to companies within the healthcare sector, stating that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs)" and pointed out that "[t]he biggest vulnerability was the perception of IT healthcare professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise." The same warning specifically noted that "[t]he FBI has observed malicious actors targeting healthcare-related systems, perhaps for the purpose of obtaining Protected Health Information (PHI)

---

[30] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://www.armor.com/resources/blog/stolen-pii- ramifications-identity-theft-fraud-dark-web/ (last visited Nov. 13, 2025).

and/or PII."[31]

83. Ransomware attacks are especially prevalent in the industry. For years federal agencies have warned about the increasing risk of ransomware attacks on companies holding PII and PHI. For example, in October 2019 the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[32]

84. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[33]

85. In March 2021, Tenable Security Response Team conducted a root

[31] Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (Apr. 8, 2014), FBI Cyber Division Private Industry Notification (available at https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf) (last accessed Nov. 13, 2025).
[32] https://www.ic3.gov/Media/Y2019/PSA191002 (last visited Nov. 13, 2025).
[33] https://www.cisa.gov/stopransomware/ransomware-faqs#:~:text=Malicious%20actors%20continue%20to%20adjust,as%20secondary%20forms%20of%20extortion (last visited Nov. 13, 2025).

cause analysis of 293 healthcare breaches known to have exposed records between January 2020 and February 2021 and concluded that "ransomware was by far the most prominent root case of healthcare breaches, accounting for a whopping 54.95%."[34]

86. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[35]

87. The number of reported North American data breaches increased by over 50 percent in 2021, from 1,080 in 20207, to 1,638 in 2021.[36] As a recent report reflects, "[h]ealthcare has increasingly become a target of run-of-the-mill hacking attacks and the more impactful ransomware campaigns."[37]

88. At the end of 2018, the healthcare sector ranked second in the number of data breaches among measured sectors, and had the highest rate of exposure for

---

[34] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last visited Nov. 13, 2025).
[35] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.
[36] *See* Verizon 2021 Data Breach Investigations Report, at 83, https://www.verizon.com/ business/resources/reports/2021-data-breach-investigations-report.pdf (last accessed Nov. 13, 2025).
[37] *Id.* at 62.

each breach.[38] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[39] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[40]

89. Healthcare-related breaches have persisted because criminals see electronic patient data as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the previous 12 months, with a majority of these known incidents being caused by "bad actors" such as

---

[38] *2018 End-of-Year Data Breach Report*, Identity Theft Resource Center (available at https://www.idtheftcenter.org/2018-data-breaches) (last accessed Nov. 13, 2025).

[39] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) (available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/) (last accessed Nov. 13, 2025).

[40] *Id.*

cybercriminals.[41] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[42]

90. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[43]

91. Despite all the publicly available knowledge of the serious threat of compromises of personal information and despite holding the Private Information of

---

[41] 2019 HIMSS Cybersecurity Survey (available at https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf) (last accessed Nov. 13, 2025).
[42] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Apr. 4, 2019 (available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks) (last accessed Nov. 13, 2025).
[43] Andis Robeznieks, Cybersecurity: *Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019) (available at https://www.ama-assn.org/practice-

a multitude of individuals, Optalis failed to use reasonable care in maintaining the privacy and security of Plaintiffs' and Class Members' Private Information.

92. Had Optalis implemented adequate security measures, cybercriminals never could have accessed millions of individuals' files and the Data Breach would have been prevented or much smaller in scope.[44] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[45] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…."[46]

93. As major healthcare services providers, Optalis was, or should have been, fully aware of the significant number of individuals whose Private Information it collected and stored, thus, the significant number of individuals who would be harmed by a breach of Optalis's systems.

94. Accordingly, Optalis knew, or reasonably should have known, of the importance of safeguarding Private Information and the foreseeable consequences

---

[44] Lucy L. Thompson, "*Despite the Alarming Trends, Data Breaches Are Preventable*," in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[45] *Id.* at 17.
[46] *Id.* at 28.

that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on affected individuals as a result of the breach.

**E. Optalis Failed to Perform Multiple Duties Imposed by Statute and Regulation**

95. Federal and state regulators have established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and the healthcare sector. There are a number of state and federal laws, requirements, and industry standards governing protection of Private Information.

96. For example, at least 24 states have enacted laws addressing data security practices that require businesses that own, license, or maintain Private Information about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access.

97. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible

communication system; and training staff regarding critical points.[47]

98. The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[48]

99. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[49]

100. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

101. The FTC advises companies not to keep information for longer periods

---

[47] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security (last visited Nov. 13, 2025).

[48] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/ documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Nov. 13, 2025).

[49] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/ documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 13, 2025).

of time than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

102. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

103. Optalis's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

104. Optalis's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

105. Furthermore, Optalis is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set

nationwide standards for protecting health information, including health information stored electronically.

106. The Security Rule requires Optalis to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.[50]

107. Pursuant to HIPAA's mandate that Optalis follow "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health information," 45 CFR § 164.302, Optalis was required to, at minimum, "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 CFR § 164.312(a)(1).

[50] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last visited Nov. 13, 2025).

108. Optalis is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

109. Both HIPAA and HITECH obligate Optalis to follow reasonable security standards, respond to, contain, and mitigate security violations, and protect against disclosure of sensitive patient Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

110. Optalis was at all times fully aware of its obligation to protect Plaintiffs' and Class Members' PII and PHI because of its position as a healthcare provider. Optalis was also aware of the significant repercussions that would result from its failure to do so.

111. As alleged in this Complaint, Optalis has failed to comply with HIPAA and HITECH. It has failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of PHI.

### F. Optalis Failed to Comply with Industry Practices

112. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential

cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[51] All organizations collecting and handling Private Information, such as Arbor, are strongly encouraged to follow these controls.

113. Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[52]

114. Cybersecurity experts normally have identified data management companies, like Optalis as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect, use, and maintain.[53]

115. Several best practices have been identified that a minimum should be implemented by data management companies like Optalis, including but not limited to securely configuring business software, managing access controls and

[51] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 13, 2025).
[52] *See CIS Benchmarks FAQ*, Center for Internet Security, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited Nov. 13, 2025).
[53] *See Security Questions to Ask After the ZeroedIn Breach*, Information Week, https://www.informationweek.com/cyber-resilience/security-questions-to-ask-after-the-zeroedin-breach (last visited Nov. 13, 2025) (commenting that the growing outsourcing of data analytics work to third-party service providers may offer to malicious cyber-attackers novel “targets of opportunity – breach one data manager and gain access to data from a multitude of sources.).

vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[54]

116. Other best practices have been identified that a minimum should be implemented by companies like Optalis using third-party providers, including but not limited to ensuring that Private Information is only shared with third parties when reasonably necessary and that those vendors have appropriate cybersecurity systems and protocols in place.[55]

117. Optalis failed to follow these and other industry standards to adequately protect the Private Information of Plaintiffs and Class Members.

**G. Optalis's Conduct Violated HIPAA**

118. HIPAA requires covered entities such as Optalis to protect against reasonably anticipated threats to the security of sensitive patient health information.

119. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

120. Optalis is bound by HIPAA (see 45 C.F.R. § 160.102) and, as a result, is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part

---

[54] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 13, 2025).
[55] *See id*.

160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

121. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Optalis left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a) (1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

122. These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

123. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."

124. HIPAA requires that Optalis implement appropriate safeguards for this information.

125. A Data Breach such as the one Optalis experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, ". . . the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. § 164.40.

126. Furthermore, unlike most healthcare entities, Optalis's website makes no reference to HIPAA, and does not maintain a copy of the "Notice of Privacy Practices" that HIPAA requires all healthcare providers to make available to their patients.[56]

127. Optalis's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to meet mandated by HIPAA regulations and their own Privacy Practices. In particular, Optalis failed to:

a. maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. adequately protect Plaintiffs' and Class Members' PHI;

c. ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

[56] https://www.optalishealthcare.com/privacy-policy/.

d. implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

g. protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. ensure compliance with the electronic PHI security standard rules by their workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i. train all members of their workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of their workforce to carry out their responsibilities and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b).

128. Optalis failed to comply with its duties under HIPAA despite being aware of the risks associated with unauthorized access to Plaintiffs' and Class Members' PHI.

**H. Optalis Collected/Stored Class Members' Private Information**

129. Optalis acquired, collected, stored, and assured reasonable security over Plaintiffs' and Class Members' Private Information.

130. As a condition of its relationships with Plaintiffs and Class Members,

Optalis required that Plaintiffs and Class Members entrust Optalis with highly sensitive and confidential Private Information. Optalis, in turn, stored that information on Optalis's system that was ultimately affected by the Data Breach.

131. By obtaining, collecting and storing Plaintiffs' and Class Members' Private Information, Optalis assumed legal and equitable duties over the Private Information and knew or should have known that it was thereafter responsible for protecting Plaintiffs and Class Members' Private Information from unauthorized disclosure.

132. Plaintiffs and Class Members have taken reasonable steps to maintain their Private Information's confidentiality. Plaintiffs and Class Members relied on Optalis to keep their Private Information confidential and securely maintained, to use this information for business purposes only and to make only authorized disclosures of this information.

133. Optalis could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting its servers generally, as well as Plaintiffs' and Class Members' Private Information.

134. Optalis's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

135. Due to the high-profile nature of these breaches, and other breaches of its kind, Optalis was and/or certainly should have been on notice and aware of such attacks occurring in its industry and, therefore, should have assumed and adequately performed the duty of preparing for such an imminent attack. This is especially true given that Optalis is a sophisticated operation with the resources to put adequate data security protocols in place.

136. And yet, despite the prevalence of public announcements of data breach and data security compromises, Optalis failed to take appropriate steps to protect Plaintiffs and Class Members' Private Information from being compromised.

**I. Optalis's Failed Response to the Breach**

137. Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiffs' and Class Members' Private Information with the intent of misusing the Private Information, including marketing and selling Plaintiffs' and Class Members' Private Information.

138. Optalis, by way of its notice, did not indicate when the Data Breach was discovered, nor did it state when it "immediately launched" an investigation into the breach.[57] The Notice only provided bare details of the Data Breach and Optalis's recommended next steps.

139. Plaintiffs and Class Members were required to provide their Private

[57] Exhibit A, Notice.

Information to Optalis in order to receive services and/or employment. Thus, Optalis created, collected and stored Plaintiffs' and Class Members' Private Information with the reasonable expectation and mutual understanding that Optalis would comply with its obligations to keep such information confidential and secure from unauthorized access.

140. Despite this, Plaintiffs and the Class Members remain, even today, in the dark regarding what particular data was stolen, the particular malware used and what steps are being taken, if any, to secure their Private Information going forward. Plaintiffs and Class Members are thus left to speculate as to where their Private Information ended up, who has used it and for what potentially nefarious purposes. Indeed, they are left to further speculate as to the full impact of the Data Breach and how exactly Optalis intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

141. Plaintiffs' and Class Members' Private Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without Plaintiffs' and/or Class Members' approval. Either way, unauthorized individuals can now easily access Plaintiffs' and Class Members' Private Information.

## J. Optalis Had a Duty to Protect the Stolen Information

142. In failing to adequately secure Plaintiffs' and Class Member's sensitive

data, Optalis breached duties it owed Plaintiffs and Class Members under statutory and common law.

143. Plaintiffs and Class Members surrendered their highly sensitive Private Information to Optalis under the implied condition that Optalis would keep it private and secure. Accordingly, Optalis also has an implied duty to safeguard their Private Information, independent of any statute.

144. Optalis was also prohibited by the FTCA from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

145. In addition to its obligations under federal and state laws, Optalis owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Private Information in Optalis's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Optalis owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks and protocols adequately protected Plaintiffs' and Class Members' Private Information.

146. Optalis owed a duty to Plaintiffs and Class Members to design,

maintain and test its computer systems, servers and networks to ensure that all Private Information in its possession was adequately secured and protected.

147. Optalis owed a duty to Plaintiffs and Class Members to implement processes that would immediately detect a breach of its data security systems in a timely manner.

148. Optalis owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

149. Optalis owed a duty to Plaintiffs and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust their Private Information to Optalis.

150. Optalis owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

151. Optalis owed a duty to Plaintiffs and Class Members to encrypt Plaintiffs' and Class Members' Private Information and monitor user behavior and activity in order to identify possible threats.

**K. The Data Breach Caused Injury to Class Members and Will Result in Additional Harm Such as Fraud.**

152. Without detailed disclosure to the victims of the Data Breach, individuals whose Private Information was compromised by the Data Breach, including Plaintiffs and Class Members, were unknowingly and unwittingly exposed

to continued misuse and ongoing risk of misuse of their Private Information for months without being able to take available precautions to prevent imminent harm.

153. The harm to Plaintiffs and Class Members is acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive forms of identity theft.

154. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's PHI is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[58]

155. When cybercriminals access financial information, health insurance information and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Optalis may have exposed Plaintiffs and Class Members.

156. A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of

[58] Ollove, "*The Rise of Medical Identity Theft in Healthcare*," Kaiser Health News.

medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[59] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[60]

157. The ramifications of Optalis's failure to secure Plaintiffs' and Class Members' data are long-lasting and severe.

158. In virtually all contexts, the expenditure of time has consistently been recognized as compensable, and for many people, it is the basis on which they are compensated. Plaintiffs and Class Members should be compensated for the time they have expended because of Optalis's misfeasance.

159. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes.[61] This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with

---

[59] Elinor Mills, "*Study: Medical Identity Theft is Costly for Victims*," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[60] *Id.*; *see also* Healthcare Data Breach: What to Know About them and What to Do After One, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[61] 2014 LexisNexis True Cost of Fraud Study (available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf) (last accessed Nov. 13, 2025).

those who also reported being victims of identity fraud.

160. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[62] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[63]

161. Identity thieves can use Private Information, such as that of Plaintiffs and Class Members, which Optalis failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

162. As demonstrated herein, these and other instances of fraudulent misuse of the compromised Private Information have already occurred and are likely to

---

[62] 17 CFR § 248.201 (2013).
[63] *Id.*

continue.

163. As a result of Optalis's delay between the Data Breach in April 2025 and the notice of the Data Breach sent to affected persons in June 2026, the risk of fraud for Plaintiffs and Class Members increased exponentially.

164. And Plaintiffs and Class Members were unknowingly exposed to continued risk of misuse of their Private Information for months without being able to take available precautions to prevent imminent harm.

165. Javelin Strategy and Research reported that identity thieves stole $112 billion from 2011 through 2016.[64]

166. Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[65]

167. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from

---

[64] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited Nov. 13, 2025).
[65] *Victims of Identity Theft*, Bureau of Justice Statistics (Sept. 2015) http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Nov. 13, 2025).

fraudulently opened accounts or misuse of existing accounts.

168. The 2017 Identity Theft Resource Center survey[66] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fearing for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by identity theft; and
- 7% reported feeling suicidal.

169. Identity theft can also exact a physical toll on its victims. This survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;
- 37.1% reported an inability to concentrate / lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

[66] *Id.*

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[67]

170. The ramifications of Optalis's failure to protect Plaintiffs' and Class Members' PII and PHI are severe and long-lasting. Once such information is stolen, the resulting fraudulent use of that information and damage to victims may persist for years and often do not surface until months or even years later. Here, hackers stole Plaintiffs' and Class Members' Private Information to commit identity theft or sell it to other criminals for that purpose.

171. There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[68]

172. Thus, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

**L. Plaintiffs and Class Members Suffered Injuries/Damages Following Optalis's Breach of Duty.**

---

[67] *Id*.
[68] GAO, *Report to Congressional Requesters*, at 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Nov. 13, 2025).

173. As a direct and proximate result of Optalis's wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class Members have already been harmed by the fraudulent misuse of their Private Information, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands, such as work and family, in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam emails, texts, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

174. Optalis's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. theft and misuse of their PII, PHI, and financial information;

b. lost or diminished value of their PII and PHI;

c. lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

d. loss of the benefit of their bargain;

e. statutory damages;

f. nominal damages;

g. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class Members' information on the Internet's black market;

h. the untimely and inadequate notification of the Data Breach;

i. the improper disclosure of their Private Information;

j. invasion and loss of privacy;

k. ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

l. ascertainable losses in the form of deprivation of the value of their Private Information, for which there is a well-established national and international market;

m. the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach; and

n. the continued and certainly increased risk to their PII and PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Optalis's possession

and is subject to further unauthorized disclosures so long as Arbor fails to undertake appropriate and adequate measures to protect the PII and PHI.

175. While Plaintiffs' and Class Members' Private Information has been stolen, Optalis continues to hold Plaintiffs' and Class Members' Private Information. Particularly because Optalis has demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and Class Members have an undeniable interest in ensuring that their Private Information is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

**Plaintiff Danielkiewicz's Experience**

176. Plaintiff Danielkiewicz is or was, at all relevant times, an employee of Optalis.

177. As a condition of her employment with Optalis, Plaintiff Danielkiewicz provided Optalis with her PII/PHI. Optalis used that PII/PHI to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII/PHI in order to obtain employment and payment for that employment.

178. Plaintiff Danielkiewicz provided her PII/PHI to Optalis and trusted the company would use reasonable measures to protect it according to Optalis's internal policies, as well as state and federal law, such as HIPAA, HITECH, and the FTCA. Optalis obtained and continues to maintain Plaintiff Danielkiewicz's PII/PHI and therefore has a continuing legal duty and obligation to protect that PII/PHI from

unauthorized access and disclosure.

179. Plaintiff Danielkiewicz is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

180. Plaintiff Danielkiewicz reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII/PHI.

181. Plaintiff Danielkiewicz does not recall ever learning that her information was compromised in a data breach incident, other than the breach at issue here.

182. Plaintiff Danielkiewicz was not notified until over a year following the Data Breach when she became in receipt of a Notice of Breach dated June 29, 2026.[69]

183. Thus, on information and belief, Plaintiff Danielkiewicz's PII/PHI has already been published, or will be published imminently, by cybercriminals to the Dark Web.

184. Plaintiff Danielkiewicz fears for her personal financial security and worries about what information was exposed in the Data Breach.

185. But for Optalis's failure to timely notify Plaintiff Danielkiewicz that her

[69] *See, e.g.*, Notice, Exhibit A.

Private Information was accessed and stolen in the Data Breach, Plaintiff Danielkiewicz would not have to experience the anxious uncertainty that her Private Information has been long-since disseminated across the Dark Web.

186. Because of Optalis's Data Breach, Plaintiff Danielkiewicz has suffered, and will continue to suffer from, anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Danielkiewicz's injuries are precisely the type of actual, present injuries that the law contemplates and addresses.

187. Because of Optalis's Data Breach, Plaintiff Danielkiewicz's PII faces extensive diminution of value which would inhibit her ability to, for example, apply for new lines of credit for the purposes of purchasing a home or a vehicle.

188. As stated above, barriers to obtaining a new Social Security number free of any theft is difficult itself. But for Optalis's breach of its duties, Plaintiff Danielkiewicz faces impending challenges to protect and/or reapply for her Social Security number. Such challenges could have been avoided had her Private Information been adequately protected by Optalis.

189. Plaintiff Danielkiewicz suffered actual, present injury from the exposure and theft of her PII/PHI, which violates her right to privacy.

190. Plaintiff Danielkiewicz suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because

Optalis's Data Breach placed Plaintiff Danielkiewicz's PII/PHI right in the hands of criminals.

191. Because of the Data Breach, Plaintiff Danielkiewicz anticipates spending considerable amounts of time and money to try to mitigate her injuries.

192. Today, Plaintiff Danielkiewicz has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains in Optalis's possession—is protected and safeguarded from additional breaches.

**Plaintiff Muslin's Experience**

193. Plaintiff Priscilla Muslin is a former patient of Optalis, having received care from 2023 to 2024.

194. Plaintiff Muslin provided her PII/PHI to Optalis and trusted the company would use reasonable measures to protect it according to Optalis's internal policies, as well as state and federal law. Optalis obtained and continues to maintain Plaintiff Muslin's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

195. Plaintiff Muslin is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

196. Plaintiff Muslin reasonably understood that a portion of the funds paid

to Optalis would be used to pay for adequate cybersecurity and protection of PII/PHI.

197. Plaintiff Muslin does not recall ever learning that her information was compromised in a data breach incident—other than the Data Breach at issue here.

198. Plaintiff Muslin was not notified until over a year following the Data Breach when she became in receipt of a Notice of Breach dated June 29, 2026, a copy of which is attached as Exhibit A.

199. Thus, on information and belief, Plaintiff Muslin's PII/PHI has already been published, or will be published imminently, by cybercriminals to the Dark Web.

200. Plaintiff Muslin fears for her personal financial security and worries about what information was exposed in the Data Breach.

201. But for Optalis's failure to timely notify Plaintiff Muslin that her Private Information was accessed and stolen in the Data Breach, Plaintiff Muslin would not have to experience the anxious uncertainty that her Private Information has been long-since disseminated across the Dark Web.

202. Upon information and belief, Plaintiff Muslin's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

203. Through its Data Breach, Optalis compromised Plaintiff Muslin's PII/PHI.

204. Plaintiff Muslin has spent, and will continue to spend, significant time

and effort monitoring her accounts to protect herself from identity theft. After all, Optalis directed Plaintiff Muslin to take those steps in its breach notice.

205. Following Optalis's Data Breach, Plaintiff Muslin has and continues to suffer from a spike in spam and scam text messages and phone calls.

206. Access to a person's PII/PHI allows criminals to better harass victims, such as Plaintiff Muslin. But for the Data Breach, Plaintiff Muslin would not be the present target of social engineering attacks by way of spam phone calls, text messages, and/or phishing emails.

207. Plaintiff Muslin fears for her personal financial security and worries about what information was exposed in the Data Breach.

208. Because of Optalis's Data Breach, Plaintiff Muslin has suffered, and will continue to suffer from, anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Muslin's injuries are precisely the type of actual, present injuries that the law contemplates and addresses.

209. Because of Optalis's Data Breach, Plaintiff Muslin's PII faces extensive diminution of value which would inhibit her ability to, for example, apply for new lines of credit for the purposes of purchasing a home or a vehicle.

210. As stated above, barriers to obtaining a new Social Security number free of any theft is difficult itself. But for Optalis's breach of its duties, Plaintiff

Muslin faces impending challenges to protect and/or reapply for her Social Security number. Such challenges could have been avoided had her Private Information been adequately protected by Optalis.

211. Plaintiff Muslin suffered actual, present injury from the exposure and theft of her PII/PHI, which violates her right to privacy.

212. Plaintiff Muslin suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Optalis's Data Breach placed Plaintiff Muslin's PII/PHI right in the hands of criminals.

213. Because of the Data Breach, Plaintiff Muslin anticipates spending considerable amounts of time and money to try to mitigate her injuries.

214. Today, Plaintiff Muslin has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Optalis's possession—is protected and safeguarded from additional breaches.

**CLASS ACTION ALLEGATIONS**

215. Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a Class as defined below:

> All individuals residing in the United States whose Private Information was compromised as a result of the Data Breach.

216. Excluded from the Class are Optalis, any entity in which Optalis has a controlling interest, and Optalis's officers, directors, legal representatives,

successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

217. Plaintiffs reserve the right to modify or amend the definition of the proposed Class as additional information becomes available to Plaintiffs.

218. **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. Optalis disclosed to the U.S. Department of Health and Human Services Office for Civil Rights that the Data Breach affected over 13,700 individuals. All Class Members' names and addresses are available from Optalis's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

184. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether and to what extent Optalis had a duty to protect the Private Information of Class Members;

b. Whether Optalis was negligent in collecting and storing Plaintiffs' and Class Members' Private Information;

c. Whether Optalis had duties not to disclose the Private Information of Class Members to unauthorized third parties;

d. Whether Optalis took reasonable steps and measures to safeguard

Plaintiffs' and Class Members' Private Information;

e. Whether Optalis failed to adequately safeguard the Plaintiffs' and Class Members' Private Information;

f. Whether Optalis failed to implement and maintain reasonable security policies and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether Optalis adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

h. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or punitive damages because of Optalis's wrongful conduct;

i. Whether Plaintiffs and Class Members are entitled to restitution because of Optalis's wrongful conduct;

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm they face because of the Data Breach; and

k. Whether Plaintiffs and Class Members are entitled to identity theft protection for their respective lifetimes.

219. **Typicality:** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was disclosed by Optalis. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through Optalis's common misconduct. Plaintiffs are advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no

defenses that are unique to Plaintiffs. Plaintiffs' claims and Class Members' claims arise from the same operative facts and are based on the same legal theories.

220. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Optalis to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach litigation. Plaintiffs intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

221. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Optalis has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Optalis's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Optalis's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

222. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy

alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Optalis. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

223. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Optalis would necessarily gain an unconscionable advantage in non-class litigation, since Optalis would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by Class Members and will establish the right of each Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

224. The litigation of Plaintiffs' claims is manageable. Optalis's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with maintenance of this lawsuit as a class action.

225. Adequate notice can be given to Class Members directly using information maintained in Optalis's records.

226. Unless a class-wide injunction is issued, Optalis may continue to maintain inadequate security with respect to the Private Information of Class Members, Optalis may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Optalis may continue to act unlawfully as set forth in this Complaint.

227. Optalis has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

**COUNT I**
**NEGLIGENCE & NEGLIGENCE *PER SE***
**(on behalf of Plaintiffs and the Class)**

228. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

229. Optalis knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, thereby imposing a duty to

exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. That duty included, among other things, designing, maintaining, and testing Optalis's security protocols to ensure that Plaintiffs' and Class Members' Private Information in Optalis's possession was adequately secured and protected, that Plaintiffs' and Class Members' Private Information on Optalis's networks were not accessible to criminals without authorization, and that Optalis's employees tasked with maintaining such information were adequately trained on security measures regarding the security of Plaintiffs' and Class Members' Private Information.

230. Plaintiffs and Class Members entrusted their Private Information to Optalis with the understanding that Optalis would safeguard their information, use their Private Information for business purposes only, and not disclose their Private Information to unauthorized third parties.

231. Optalis knew or reasonably should have known that a breach of its duty to provide reasonable care in the collection, storage, and use of Plaintiffs' and Class Members' Private Information involved an unreasonable risk of harm to Plaintiffs and Class Members.

232. Optalis had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' Private Information.

233. A breach of security, unauthorized access, and resulting injury to

Plaintiffs and Class Members was reasonably foreseeable, particularly in light of prior data breaches and disclosures prevalent in today's digital landscape, including the explosion of data breaches involving similarly situated healthcare providers.

234. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Optalis knew or should have known of the inherent risks in collecting and storing Plaintiffs' and Class Members' Private Information, the critical importance of providing adequate security of that information, the necessity for encrypting PHI stored on Optalis's systems, and that they had inadequate IT security protocols in place to secure Plaintiffs' and Class Members' Private Information.

235. Optalis's misconduct created a present injury for Plaintiffs and Class Members insofar that the exposure of PII/PHI has enabled cybercriminals to harass, track, and/or target victims, such as Plaintiffs and Class Members, through social engineering attacks in the form of increased spam/scam phone calls and text messages and phishing emails.

236. Optalis's misconduct created a foreseeable risk of harm to Plaintiffs and Class Members. Optalis's misconduct included, but was not limited to, failure to take the steps and opportunities to prevent the Data Breach as set forth herein.

237. Plaintiffs and Class Members had no ability to protect their Private Information that was in Optalis's possession.

238. Optalis was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

239. Optalis had, and continues to have, a duty to timely disclose that Plaintiffs' and Class Members' Private Information within their possession was compromised and precisely the type(s) of information that were compromised.

240. Optalis had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

241. Optalis systematically failed to provide adequate security for data in its possession.

242. Optalis, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within its possession.

243. Optalis, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

244. Optalis, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the Private Information

within Optalis's possession might have been compromised and precisely the type of information compromised.

245. Optalis's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

246. But for all of Optalis's acts of negligence detailed above, including allowing cyber criminals to access its systems containing Plaintiffs' and Class Members' Private Information, that Private Information would not have been compromised.

247. Optalis's breach of duties has enabled data thieves to obtain access to previous PII/PHI, including but not limited to, Social Security numbers. This information alone is sufficient for cybercriminals to attack victims, such as Plaintiffs and Class Members.

248. Plaintiffs never transmitted their own unencrypted PHI over the Internet or any other unsecured source.

249. Following the Data Breach, Plaintiffs' Private Information has been seized by unauthorized third parties who are now free to exploit and misuse that Private Information, and Plaintiffs are unable to prevent its further dissemination. Plaintiffs' Private Information are forever compromised.

250. But for Optalis's Data Breach, Plaintiffs would not have incurred the loss and publication of their Private Information and other injuries.

251. There is a close causal connection between Optalis's failure to implement security measures to protect Plaintiffs' and Class Members' Private Information and the harm suffered, both imminently and presently, by Plaintiffs and Class Members. Plaintiffs' and Class Members' Private Information was accessed and compromised as the proximate result of Optalis's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures and encryption.

252. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, loss of privacy, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

253. As a result of Optalis's negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

254. Plaintiffs seek the award of actual damages on behalf of themselves and the Class.

255. Plaintiffs seek injunctive relief on behalf of the Class in the form of an Order (1) compelling Optalis to institute appropriate data collection and safeguarding methods and policies with regard to patient information; and (2) compelling Optalis to provide detailed and specific disclosure of what types of

Private Information have been compromised as a result of the Data Breach.

256. Plaintiffs' and Class Members' Private Information constitute personal property that was stolen due to Optalis's negligence, resulting in present and imminent harm, injury and damages to Plaintiffs and Class Members.

257. In addition, violations of statutes which establish a duty, as well as a breach, to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

258. Section 5 of the FTCA prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Optalis, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Optalis's duty in this regard.

259. Optalis violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and not complying with applicable industry standards, as described in detail herein. Optalis's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

260. Optalis's breach of its duty imposed by Section 5 of the FTCA

constitutes negligence *per se*.

261. Plaintiffs and Class Members are within the class of persons that the FTCA was intended to protect.

262. The harm that occurred as a result of the Data Breach is the type of harm against which the FTCA was intended to guard. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

263. In addition, Optalis owed a duty of care to Plaintiffs and Class Members under HIPAA. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.

185. The Data Breach resulted from multiple failures by Optalis to implement adequate security, including:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards under 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages, in violation of 45 C.F.R. § 164.404(b); and

h. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii).

264. These regulations were intended to protect Plaintiffs and Class Members, and Optalis's failure to abide by them caused Plaintiffs and Class Members damages.

265. But for Optalis's breach of its statutorily imposed duty which ultimately led to the Data Breach, Plaintiffs and Class Members would not have sustained present and imminent harm as alleged herein.

266. Optalis's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' unencrypted Private Information, and Plaintiffs and Class Members have

suffered and will continue to suffer damages as a result of Optalis's breach of its duties. Plaintiffs and Class Members seek damages and other relief as a result of Optalis's negligence.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiffs and the Class)**

267. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

268. When Plaintiffs and Class Members provided their Private Information to Optalis, they entered into implied contracts with Optalis, under which Optalis agreed to take reasonable steps to protect Plaintiffs' and Class Members' Private Information, comply with its statutory and common law duties to protect Plaintiffs' and Class Members' Private Information, and to timely notify them in the event of a data breach.

269. Optalis solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Optalis's provision of medical services and related services. Plaintiffs and Class Members accepted Optalis's offers and provided their Private Information to Optalis.

270. When entering into implied contracts, Plaintiffs and Class Members reasonably believed and expected that Optalis's data security practices complied with its statutory and common law duties to adequately protect Plaintiffs' and Class

Members' Private Information and to timely notify them in the event of a data breach.

271. Optalis's implied promise to safeguard Private Information is evidenced by, *e.g.*, the representations in Optalis's privacy policy set forth above.

272. Plaintiffs and Class Members would not have provided their Private Information to Optalis had they known that Optalis would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

273. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Optalis.

274. Optalis breached its implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

275. The losses and damages Plaintiffs and Class Members sustained include, but are not limited to:

a. Theft of their Private Information;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their Private Information;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from

taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling, and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Optalis with the mutual understanding that Optalis would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Optalis's possession and is subject to further breaches so long as Optalis fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

276. As a direct and proximate result of Arbor's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(on behalf of Plaintiffs and the Class)**

277. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

278. As a vendor in the healthcare industry, Optalis has a special relationship to its employees, customers, and/or clients, like Plaintiffs and the Class Members. That special relationship was reinforced by Optalis's Privacy Policy, which specifically states that Optalis will take steps to keep its patients' Private Information secure.

279. Because of that special relationship, Optalis was provided with and stored private and valuable Private Information belonging to Plaintiffs and Class Members, which it was required to maintain in confidence.

280. Plaintiffs and Class Members provided Optalis with their Private Information in reliance on Optalis's express promise to protect and limit the use and disclosure of such Private Information.

281. Plaintiffs and Class Members were entirely reliant upon Optalis to ensure that their Private Information was adequately protected because Optalis was in an exclusive position to guard against the Data Breach.

282. In light of the special relationship between Optalis and Plaintiffs and Class Members, Optalis became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Optalis

stored.

283. Optalis had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with its residents, patients, and/or employees, in particular, to keep their Private Information secure.

284. Optalis breached its fiduciary duty to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

285. Optalis breached its fiduciary duty to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

286. Optalis breached its fiduciary duty owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

287. Optalis breached its fiduciary duty to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

288. As a direct and proximate result of Optalis's breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of

their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Optalis's possession and is subject to further unauthorized disclosures so long as Optalis fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Optalis's services they received.

289. As a direct and proximate result of Optalis's breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(on behalf of Plaintiffs and the Class)**

290. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

291. Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to, collected by, and maintained by

Optalis and that was ultimately accessed or compromised in the Data Breach.

292. As a vendor in the healthcare industry, Optalis has a special relationship to its employees, customers, and/or clients, like Plaintiffs and the Class Members.

293. Because of that special relationship, Optalis was provided with and stored private and valuable Private Information belonging to Plaintiffs and Class Members, which it was required to maintain in confidence.

294. Plaintiffs and Class Members provided Optalis with their Private Information pursuant to Optalis's express and/or implied agreement to limit the use and disclosure of such Private Information.

295. Optalis had a common law duty to maintain the confidentiality of Plaintiffs' and Class Members' Private Information.

296. Optalis owed a duty to Plaintiffs and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

297. Plaintiffs and Class Members have a privacy interest in their personal and health matters, and Optalis had a duty not to disclose their confidential personal and health-related information.

298. As a result of the parties' relationship of trust, Optalis had possession and knowledge of the confidential Private Information of Plaintiffs and Class

Members.

299. Plaintiffs' and Class Members' Private Information is not generally known to the public and is confidential by nature.

300. Plaintiffs and Class Members did not consent to nor authorize Optalis to release or disclose their Private Information to an unknown criminal actor.

301. Optalis breached the duty of confidence it owed to Plaintiffs and Class Members when Plaintiffs' and Class Members' Private Information was disclosed to unknown criminal hackers by way of Optalis's acts and omissions, as alleged herein.

302. Optalis breached its duties of confidence by failing to safeguard Plaintiffs' and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began

or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; (h) storing Private Information in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiffs' and Class Members' Private Information to a criminal third party.

303. But for Optalis's wrongful breach of its duty of confidences owed to Plaintiffs and Class Members, their privacy, confidences, and Private Information would not have been compromised.

304. As a direct and proximate result of Optalis's breach of Plaintiffs' and Class Members' confidences, Plaintiffs and Class Members have suffered or will suffer injuries, including: the erosion of the essential and confidential relationship between Optalis—as a health services provider—and Plaintiffs and Class Members as employees, customers, and/or clients; loss of their privacy and confidentiality in their Private Information; theft of their Private Information; costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; costs associated with purchasing credit monitoring and identity theft protection services; lowered credit scores resulting from credit inquiries following fraudulent activities; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Optalis's Data Breach —including finding

fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Optalis with the mutual understanding that Optalis would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; continued risk of exposure to hackers and thieves of their Private Information, which remains in Optalis's possession and is subject to further breaches so long as Optalis fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and/or mental anguish accompanying the loss of confidences and disclosure of their confidential Private Information.

305. Optalis breached the confidence of Plaintiffs and Class Members when it made an unauthorized release and disclosure of their confidential Private Information and, accordingly, it would be inequitable for Optalis to retain the benefit at Plaintiff' and Class Members' expense.

306. As a direct and proximate result of Optalis's breach of confidences, Plaintiffs and Class Members are entitled to damages, including compensatory,

punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**COUNT V**
**UNJUST ENRICHMENT**
**(on behalf of Plaintiffs and the Class)**

307. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

308. Plaintiffs and Class Members have an interest, both equitable and legal, in their PHI and PII that was conferred upon, collected by, and maintained by Optalis and that was stolen in the Data Breach.

309. Optalis benefited from the conferral upon it of Plaintiffs' and Class Members' Private Information, and by its ability to retain and use that information. Optalis understood that it so benefited.

310. Optalis also understood and appreciated that Plaintiff' and Class Members' PHI and PII was private and confidential and that its value depended upon Optalis maintaining its privacy and confidentiality.

311. But for Optalis's willingness and commitment to maintain its privacy and confidentiality, that PHI and PII would not have been transferred to and entrusted with Optalis. Further, if Optalis had disclosed that its data security measures were inadequate, Optalis would not have been permitted to continue in operation by regulators and the healthcare marketplace.

312. As a result of Optalis's wrongful conduct as alleged in this Complaint (including, among other things, its failure to employ adequate data security measures, its continued maintenance and use of Plaintiffs' and Class Members' Private Information without having adequate data security measures, and its other conduct facilitating the theft of that Private Information), Optalis have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members.

313. Optalis's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compilation and use of Plaintiffs' and Class Members' sensitive PHI and PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers.

314. Under the common law doctrine of unjust enrichment, it is inequitable for Optalis to be permitted to retain the benefits it received, and is still receiving, without justification, from the use of Plaintiffs' and Class Members' Private Information in an unfair and unconscionable manner. Optalis's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

315. The benefit conferred upon, received, and enjoyed by Optalis was not conferred officiously or gratuitously, and it would be inequitable and unjust for Optalis to retain the benefit.

**COUNT VI**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(Mich. Comp. Laws §445.911, et seq.)**
**(On Behalf of Plaintiff Muslin and the Class)**

316. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

317. Plaintiff Muslin is authorized to bring this claim under Mich. Comp. Laws § 445.911.

318. The Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.911, *et seq*., prohibits "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade of commerce[.]" Mich. Comp. Laws § 445.903(1).

319. As described herein, Optalis has engaged in the following unfair, unconscionable, and deceptive trade practices that are made unlawful under the below subsections of the MCPA, Mich. Comp. Laws § 445.903(1):

> (c) Representing that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that it does not have;
>
> (e) Representing that goods or services are of a particular standard, quality, or that goods are of a particular style or mode, if they are of another;
>
> (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; and
>
> (cc) Failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner.

320. Optalis made affirmative representations, including that it would ensure the highly sensitive personal information it maintained was secure and would prevent unauthorized access or disclosures, to protect security of Class Members' Private Information. Optalis failed to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failed to disclose that it did not have adequately robust computer systems and security practices to safeguard client PII; failed to take standard and reasonably available steps to prevent the Data Breach; failed to properly train its staff and employees on proper security measures; and failed to provide Class Members prompt and adequate notice of the Data Breach.

321. Optalis omitted and actively concealed material facts regarding its inadequate security policies and practices from the Class and withheld and continues to withhold information regarding the full nature and extent of the Data Breach.

322. Had Optalis disclosed that its data systems lacked the almost universal safeguards described above, the Class would not have allowed Optalis to collect and maintain their Private Information.

323. Optalis's deceptive acts or practices in the conduct of commerce include, but are not limited to:

a. Failing to implement and maintain reasonable security and privacy measures to protect Class Members' Private Information, which was a direct and proximate cause of the Data Breaches;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which were direct and proximate causes of the Data Breaches;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Class Members' Private Information, including but not limited to duties imposed by the FTC Act, which were the direct and proximate causes of the Data Breaches;

d. Misrepresenting that it would protect the privacy and confidentiality of Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Class Members' Private Information.

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Class Members' Private Information;

g. Omitting, suppressing, and concealing the material fact that it did not comply with the common law, statutory, and self-imposed duties pertaining to the security and privacy of Class Members' Private Information; and

h. Failing to promptly and adequately notify Class Members that their Private Information was accessed by unauthorized actors in the Data Breach.

324. Optalis is engaged in, and its acts and omissions affect, trade and commerce. Optalis's relevant acts, practices, and omissions complained of in this action were done in the course of Optalis's business of marketing, offering, for sale, and selling goods and services throughout the State.

325. Optalis had exclusive knowledge of material information regarding its

deficient security policies and practices, and regarding the security of Class Members' Private Information. This exclusive knowledge includes, but is not limited to, knowledge that Optalis did not have adequately robust computer systems and security practices to safeguard client PII; its failure to take standard and reasonably available steps to prevent the Data Breach; its failure to train its staff and employees on proper security measures and failure to properly monito the computer network and systems that housed Private Information and that Class Members' Private Information and other Optalis data was vulnerable.

326. Optalis failed to disclose, and actively concealed, the material information it had regarding Optalis's deficient security policies and practices, and regarding the security of the sensitive Private Information. For example, for approximately 441 days after the Data Breach began, Optalis failed to disclose, and actively concealed, information that it had regarding the extent and nature of the Data Breach.

327. Optalis also had a duty to disclose the material information that it had because, *inter alia*, it had exclusive knowledge of the information, it actively concealed the information, and because Optalis was in a fiduciary position by virtue of the fact that Optalis collected and maintained Class Members' Private Information.

328. Optalis's representations and omissions were material because they

were likely to deceive reasonable individuals about the adequacy of Optalis's data security and its ability to protect the confidentiality of Class Members Private Information.

329. Had Optalis disclosed to Class Members that its data systems were not secured and, thus, vulnerable to attack, Optalis would have been unable to continue in business without adopting reasonable data security measures, as reflected in laws, such as HIPAA and the FTC Act.

330. Optalis generated revenue by way of Class Members paying or generating medical insurance payments when entering transactions with Optalis where Optalis was the direct beneficiaries of these payments. Optalis's services were of a lesser quality and value than Optalis represented in that Optalis did not take reasonable measures to safeguard customers' personal medical information. In reliance on Optalis's misrepresentations about its products and services, Class Members entered into transactions with Optalis that they would not have, or for which Class Members would have paid less but for Optalis's representations.

331. The injuries suffered by Class Members greatly outweigh any potential countervailing benefit to patients/consumers or to competition and are not injuries that Class Members should have reasonably avoided.

332. The damages, ascertainable losses and injuries, including to their money or property, suffered by Class Members as a direct result of Optalis's

deceptive acts and practices as set forth herein include, without limitation:

333. Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Optalis's possession and is subject to further unauthorized disclosures so long as Optalis fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Class Members; and (vii) the diminished value of Optalis's services they received.

334. Class Members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Optalis from disclosing their Private Information without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

**COUNT VII**
**INJUNCTIVE/DECLARATORY RELIEF**
**(on behalf of Plaintiffs and the Class)**

335. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

336. Optalis owes a duty of care to Plaintiffs and Class Members requiring it to adequately secure Private Information.

337. Optalis still stores Plaintiffs' and Class Members' Private Information.

338. Since the Data Breach, Optalis has announced no specific changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent similar incidents from occurring in the future.

339. Optalis has not satisfied its legal duties to Plaintiffs and Class Members.

340. Actual harm has arisen in the wake of the Data Breach regarding Optalis's duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information, and Optalis's failure to address the security failings that led to that exposure.

341. Plaintiffs, therefore, seek a declaration that: (a) Optalis's existing security measures do not comply with its duties of care to provide adequate security; and (b) to comply with its duties of care, Optalis must implement and maintain

reasonable security measures, including, but not limited to, the following:

a. ordering that Optalis engage third-party security auditors as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Optalis's systems on a periodic basis, and ordering Optalis to promptly correct any problems or issues detected by such third-party security auditors;

b. ordering that Optalis engage third-party security auditors and internal personnel to run automated security monitoring;

c. ordering that Optalis audit, test, and train its security personnel regarding any new or modified procedures;

d. ordering that Optalis segment PHI by, among other things, creating firewalls and access controls so that if one area of Optalis's system is compromised, hackers cannot gain access to other portions of Optalis's systems;

e. ordering that Optalis purge, delete, and destroy in a reasonably secure manner Private Information not necessary for its provision of services;

f. ordering that Optalis conduct regular computer system scanning and security checks; and

g. ordering that Optalis routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

a. for an Order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

b. for equitable relief enjoining Optalis from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of

Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

c. for equitable relief compelling Optalis to use appropriate cybersecurity methods and policies with respect to Private Information collection, storage, and protection, and to disclose with specificity to Class Members the types of Private Information compromised;

d. for an award of damages, including actual, nominal, consequential, enhanced compensatory, and punitive damages, as allowed by law in an amount to be determined;

e. for an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. for prejudgment interest on all amounts awarded; and

g. such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 31, 2026

*<u>/s/ E. Powell Miller</u>*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com

Raina Borrelli
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: 872.263.1100
raina@straussborrelli.com

Gary Klinger
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
(866) 252-0878
gklinger@milberg.com

*Interim Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2026, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com